## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| PETER J. WELLIN, *et. al.*, | ) | |
| | ) | No. 2:14-cv-4067-DCN |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WENDY WELLIN, *individually and as Trustee* | ) | **ORDER** |
| *of the Keith S. Wellin Florida Revocable Living* | ) | |
| *Trust u/a/d December 11, 2011*, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant Wendy Wellin's ("Wendy") motion to dismiss ten of the eleven claims asserted against her by plaintiffs Peter J. Wellin ("Peter"), Cynthia Wellin Plum ("Cynthia"), and Marjorie Wellin King ("Marjorie"). For the reasons set forth below, the court grants in part and denies in part Wendy's motion to dismiss.

## I.  BACKGROUND[1]

On October 20, 2014, Keith Wellin's ("Keith") three adult children—Peter, Cynthia, and Marjorie (collectively, "the Wellin children"), individually and as co-trustees and beneficiaries of the Wellin 2009 Irrevocable Trust—filed a complaint against Wendy, individually and as trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001. The complaint alleges that

> [t]hrough her prolonged and consistent pattern of mistreatment toward the children and Keith, Wendy defamed the children to Keith and others, unduly influenced and coerced Keith with respect to his finances and estate planning, isolated Keith from his children, grandchildren, and other relatives, instilled in Keith anger, distrust, and hatred toward his three

---

[1] These facts are drawn from the plaintiffs' complaint.

1

children, and, ultimately, enriched herself and her family at the expense of the children and Keith's other lineal descendants.

Compl. ¶ 3.

Wendy, to whom Keith was married for almost twelve years before his death on September 14, 2014, was Keith's fourth wife.  Id. ¶¶ 14–15.  The Wellin children, who collectively have eight children, assert that both they and their children maintained a "close, loving relationship" with Keith until 2013.  Id. ¶¶ 17–18.  At the time of his marriage to Wendy, Keith's net worth exceeded $150 million.  Id. ¶ 20.

On November 12, 2002, shortly before their marriage, Keith and Wendy entered into a prenuptial agreement.  Id. ¶ 21.  The prenuptial agreement "[sought] to protect [the Wellin children's] interests in [Keith's] estate by having this Agreement in full force and effect."  Id. ¶ 22.  The prenuptial agreement identified Keith's assets at the time of his marriage as "Keith's Separate Property" and provided that Wendy "waive[d] any claim to whatsoever to [Keith's] Separate Property . . . that she may now have or hereinafter acquire as Keith's Wife."  Id. ¶ 23.  The prenuptial agreement provided that Wendy would receive $7.6 million in the event Keith predeceased Wendy and they were still married, and further provided that should Keith become infirm or mentally incapacitated, Wendy would not take actions to limit the Wellin children's access to Keith.  Id. ¶¶ 24–25.

In 2001, Keith, with the assistance of attorney Tom Farace ("Farace"), created the Keith S. Wellin Florida Revocable Living Trust ("the Revocable Trust"), which was the primary instrument that provided for distribution of Keith's assets upon his death.  Id. ¶ 33.  Under the terms of the Revocable Trust, Keith was the trustee, Peter was the successor trustee, and Cynthia was the backup successor trustee.  Id. ¶ 34.  Over the

course of his marriage to Wendy and prior to 2013, Keith revised the Revocable Trust on multiple occasions, increasing the fixed amount Wendy would receive upon his death from $7.6 million to $25 million.  Id.  At all times prior to 2013, Keith's estate planning documents were structured so that Wendy would receive a fixed amount, and the Wellin children would receive the bulk of Keith's residuary estate, an amount significantly greater than the amount left to Wendy.  Id. ¶ 35.

In 2003, Keith set aside approximately 900 shares of Berkshire Hathaway stock for the benefit of the Wellin children.  Id. ¶ 36.  Acting on the advice of Farace, Keith placed these shares in a family limited partnership (the "LP").  Id.  Keith retained a 98.9% limited partnership interest in the LP, but the LP was controlled by the Wellin children.  Id.  The purpose of this transaction was to reduce Keith's tax liability and protect his assets for the Wellin children.  Id.  Between 2003 and 2009, Keith's estate planning documents provided that when Keith died, the Wellin children would receive his 98.9% interest in the LP.  Id. at 37.  In 2009, Farace advised Keith to enter into a another transaction, whereby Keith would create an intentionally defective grantor trust, the Wellin Family 2009 Irrevocable Trust (the "Irrevocable Trust"), naming the Wellin children as beneficiaries, and transfer his 98.9% interest in the LP to the Irrevocable Trust in exchange for a promissory note.  Id. at 38.  Farace clearly communicated with Keith about the advantages and disadvantages of this transaction.  Id.  Before and after the 2003 and 2009 transactions, Keith's estate planning documents provided that the Wellin children would receive the value of the Berkshire Hathaway shares, while Wendy would receive a fixed amount as provided in the Revocable Trust.  Id. at 40.

3

Beginning in 2011, Keith's health began to deteriorate, which increased his dependence on Wendy and caregivers controlled by Wendy to provide for his health and safety.  Id. ¶ 48.  Around July 29, 2011, Keith, acting as trustee of the Revocable Trust, divided a UBS account which held the majority of the Revocable Trust's liquid assets into two separate accounts.  Id. ¶ 44.  Keith then executed a power of attorney appointing Wendy as his attorney-in-fact with respect to one such account, UBS Account number XXX-4378.  Id.

In the spring of 2013, Keith's mental capacity began to decline.[2]  Id. ¶ 49.  During this time period, Keith terminated Farace and other long-time advisors and retained new attorneys and advisors, including attorneys selected by Wendy.  Id. ¶ 50.  The new attorneys requested that the Wellin children prepay the promissory note held by the Irrevocable Trust so that Keith could transfer the $25 million bequest to Wendy, as set out in the Revocable Trust, prior to his death.  Id. ¶ 51.  In the spring or summer of 2013, Keith transferred $4.5 million to Wendy, which she used to purchase a home in Sullivan's Island, South Carolina.  Id. ¶ 52.  Around the same time, he transferred $25 million to Wendy.  Id. ¶ 53.  These transfers were the product of Wendy "manipulating, coercing or unduly influencing Keith."  Id. ¶ 54.  Also in the spring or summer of 2013, Keith failed to consummate the sale of a property in Friendship, Maine to Marjorie, even though he had previously expressed excitement about the sale.  Id. ¶ 55.

In July 2013, Keith filed a lawsuit, Wellin v. Wellin ("Wellin I"), No. 2:13-cv-1831, against the Wellin children.  Id. ¶ 56.  Around the same time, Keith revoked powers of attorney granted to Peter and Cynthia, removed Peter as successor trustee of

_____
[2] The Wellin children allege that Keith's mental capacity continued to decline until his death.  Compl. ¶ 49.

4

the Revocable Trust, and removed Cynthia as backup successor trustee of the Revocable Trust, and installed Wendy into these positions.  Id. ¶ 57.  In the months following the initiation of litigation, Keith's new lawyers drafted one or more revised versions of the Revocable Trust that eliminated or significantly reduced Keith's bequests to the Wellin children and increased his bequests to Wendy and her children.  Id. ¶ 60.

In November 2013, Keith and his new attorneys attempted to "turn off" grantor status on the Irrevocable Trust, which would have caused the Irrevocable Trust to incur over $40 million in tax liability, and attempted to execute a "swap" transaction that would have significantly reduced the assets of the Irrevocable Trust.  Id. ¶ 61.  If effective, these actions would have shifted tens of millions of dollars that would have been received by Keith's children and grandchildren to Wendy and her children.  Id.  In November 2013, Keith purported to hire a new trust protector of the Irrevocable Trust to bring a separate lawsuit, McDevitt v. Wellin ("McDevitt"), No. 2:13-cv-3595, against the Wellin children, in their capacity as trustees of the Irrevocable Trust.  Id. ¶ 62.

The Wellin children allege that "Keith's uncharacteristic and bizarre behavior" was the result of "certain lies, fraudulent misrepresentations, undue influence, coercion, and isolation" by Wendy designed to interfere with the Wellin children's inheritance and enrich herself.  Id. ¶¶ 70–71.  The Wellin children allege that Wendy's actions to interfere with the relationship between Keith and his children include:  (1) preventing the Wellin children from visiting Keith; (2) refusing to answer calls from the Wellin children and failing to inform Keith when they called; (3) insisting that she be present for all visits between Keith and the Wellin children; (4) telling Keith and others lies about the Wellin children; and (5) initiating and controlling the litigation brought by Keith against the

5

Wellin children.  Id. ¶ 72.  The Wellin children further allege that Wendy has taken steps to influence Keith with respect to his finances and estate planning, including:  (1) "coaching" Keith regarding what he should say to lawyers, health care providers, friends, and others regarding the facts of the lawsuits; (2) meeting with Keith's lawyers outside his presence and instructing them on Keith's intentions with respect to the litigation; (3) disseminating communications on behalf of Keith not consistent with his actual or expressed intentions; (4) coercing Keith to terminate Farace and other long-time advisors; (5) coercing Keith to change his will, the Revocable Trust, and other estate planning documents to provide more for Wendy and less for the Wellin children; (6) signing documents on Keith's behalf without his informed consent; and (7) making distributions from Keith's accounts over which Wendy served as Keith's power of attorney that were inconsistent with Keith's best interests.  Id. ¶ 74.

The Wellin children bring the following causes of action against Wendy individually:  (1) defamation; (2) intentional interference with inheritance; (3) intentional interference with prospective contractual relations/prospective economic advantage; (4) breach of fiduciary duty; (5) breach of prenuptial agreement related to the Wellin children's access to Keith; (6) breach of prenuptial agreement related to Wendy's control of Keith's separate property; (7) breach of contract accompanied by a fraudulent act; (8) constructive trust; (9) barratry; and (10) negligence per se.  The Wellin children also seek a declaratory judgment against Wendy in her official capacity declaring that "all purported amendments to the Revocable Trust after the Tenth Amendment to and

Restatement of the Revocable Trust, dated August 30, 2011 . . . were and are ineffective, invalid, <u>ultra vires</u>, and void."[3] Compl. ¶ 190.

On December 3, 2014, Wendy, in her individual capacity, moved to dismiss ten of the eleven claims for failure to state a claim.[4] The Wellin children responded to this motion on January 12, 2014. Following a hearing on February 5, 2015, the Wellin children filed a supplemental response on February 13, 2015. Wendy replied to this response on February 23, 2015. This motion has been fully briefed and it is ripe for the court's review.

## II. STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>E.I. du Pont de Nemours & Co. v. Kolon Indus.</u>, 637 F.3d 435, 440 (4th Cir. 2011). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court's task is limited to determining whether the complaint states a "plausible claim for relief." <u>Id.</u> at 679. Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to

---

[3] For the purposes of this motion, the court will refer to the Revocable Trust as it stood on August 30, 2011 as the "Original Trust." <u>See</u> ECF No. 19, Ex. A. The court will refer to the version dated June 27, 2014 as the "Amended Trust." <u>Id.</u> Ex. B.

[4] Wendy does not seek dismissal of the defamation claim.

'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 570). "Facts pled that are 'merely consistent with' liability are not

sufficient." A Soc'y Without a Name v. Va., 655 F.3d 342, 346 (4th Cir. 2011) (quoting

Iqbal, 556 U.S. at 678).

### III.  DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Wendy individually moves

the court to dismiss the following claims against her: (1) intentional interference with

inheritance; (2) intentional interference with prospective contractual relations/prospective

economic advantage; (3) breach of fiduciary duty; (4) breach of prenuptial agreement—

interfering with the Wellin children's access to Keith; (5) breach of prenuptial

agreement—exercising control over Keith's separate property; (6) breach of contract

accompanied by a fraudulent act; (7) constructive trust; (8) barratry; and (9) negligent per

se.[5]  The court will address each claim in turn.

#### A.  Count II – Intentional Interference with Inheritance

Wendy first argues that the Wellin children's claim for intentional interference

with inheritance should be dismissed because it is not a recognized cause of action under

South Carolina law. Def.'s Mot. 8.  It is true that South Carolina has not adopted the tort

of international interference with inheritance.  See Douglass ex rel. Louthian v. Boyce,

542 S.E.2d 715, 717 (S.C. 2001) ("We have not adopted the tort of intentional

interference with inheritance."); Meehan v. Meehan, 2006 WL 7285712, at *3 n.3 (S.C.

Ct. App. Feb. 10, 2006) ("South Carolina has yet to recognize intentional interference

---

[5] Wendy also seeks dismissal of the Wellin children's claim for declaratory judgment "to the extent the allegations can be construed against [her] in her individual capacity." Def.'s Mot. 21.  However, this claim is clearly alleged against Wendy solely in her capacity as a trustee.  The court therefore denies Wendy's motion to dismiss the Wellin children's claim for declaratory judgment.

with inheritance rights as a valid cause of action."); see also Malloy v. Thompson, 762 S.E.2d 690, 692 (S.C. 2014) ("[T]his opinion must not be understood as either adopting or rejecting the tort of intentional interference with inheritance.").

However, this does not end the court's inquiry.  Rather, "[w]here there is no case law from the forum state which is directly on point, the district court attempts to do as the state court would do if confronted with the same fact pattern." Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994); see also Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005) ("If the Supreme Court of South Carolina has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue." (citation and internal quotation marks omitted)).  "In deciding how the courts of South Carolina would rule, this court is authorized to consider all available legal sources, including restatements of the law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the 'majority rule.'" TC X, Inc. v. Commonwealth Land Title Ins. Co., 928 F. Supp. 618, 623 (D.S.C. 1995) (citation omitted); see also Twin City Fire, 433 F.3d at 369 (holding that in predicting state law, courts may "consider lower court opinions in South Carolina, the teachings of treatises, and the practices of other states.").  The court may also consider "well considered dicta," Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002), and "recent pronouncements of general rules or policies by the state's highest court." [6] Wells v. Liddy, 186 F.3d 505, 528 (4th Cir. 1999).

---

[6] In forecasting how the South Carolina Supreme Court would decide an issue, "the South Carolina Court of Appeals' decisions, as the state's intermediate appellate court, constitute the next best indicia of what state law is."  Private Mortg., 296 F.3d at 312 (citation and internal

The court will consider the aforementioned available sources in turn to determine what the South Carolina Supreme Court would do if confronted with the instant fact pattern.

### 1.     South Carolina Supreme Court <u>Dicta</u>

The South Carolina Supreme Court's most illuminating treatment of intentional interference with inheritance comes in <u>Douglass ex rel. Louthian v. Boyce</u>.  In <u>Douglass</u>, a seventeen-year-old boy was killed in an automobile accident and the plaintiff alleged that he was the decedent's son.  542 S.E.2d at 716.  After the decedent's parents settled a wrongful death action, the plaintiff brought an action against the parents, alleging that he was entitled to recover in the wrongful death action.  <u>Id.</u>  The plaintiff later amended his complaint to assert a claim for intentional interference with inheritance rights against the parents' attorneys.  <u>Id.</u>  The court held that it did not need to decide whether to recognize a cause of action for intentional interference with inheritance because the attorneys were immune from liability to third persons arising from their professional activities.  <u>Id.</u> at 717.  However, in a footnote discussing intentional interference with inheritance, the South Carolina Supreme Court stated:

> We have adopted the closely analogous tort of intentional interference with prospective contractual relations.  <u>Crandall Corp. v. Navistar Int'l Transp. Corp.</u>, 395 S.E.2d 179 (S.C. 1990); <u>see also</u> <u>Allen v. Hall</u>, 974 P.2d 199 (Or. 1999) (intentional interference with inheritance closely analogous to intentional interference with economic relations). Most jurisdictions adopting the tort of intentional interference with inheritance have required the plaintiff to prove the following elements: (1) the existence of an expectancy (2) an intentional interference with that

quotation marks omitted).  The South Carolina Court of Appeals provides no assistance in this case, as it has not discussed intentional interference with inheritance in any detail.  <u>See</u> <u>Meehan</u>, 2006 WL 7285712, at *3 (finding intentional interference with inheritance rights not preserved for applellate review because it was not alleged in complaint); <u>Douglass ex rel. Louthian v. Boyce</u>, 519 S.E.2d 802, 807 (S.C. Ct. App. 1999) (holding that even if a claim for intentional interference with inheritance were cognizable, it would fail for other reasons).

> expectancy through tortious conduct (3) a reasonable certainty that the expectancy would have been realized but for the interference and (4) damages.  See, e.g., Nemeth v. Banhalmi, 425 N.E.2d 1187 (Ill. App. Ct. 1981); Morrill v. Morrill, 712 A.2d 1039 (Me. 1998); Doughty v. Morris, 871 P.2d 380 (N.M. Ct. App. 1994); Firestone v. Galbreath, 616 N.E.2d 202 (Ohio 1993); Wickert v. Burggraf, 570 N.W.2d 889 (Wis. 1997); see also Restatement (Second) of Torts § 774B (1979).

Id. at 717 n.4.

This discussion, though brief, is instructive.  First, the court noted that South Carolina has adopted the "closely analogous" tort of intentional interference with prospective contractual relations.  Id.  Specifically, in Crandall, the South Carolina Supreme Court "join[ed] the vast majority of [its] sister jurisdictions in recognizing" the tort of intentional interference with prospective contractual relations.  395 S.E.2d at 180. In both Crandall and Douglass, the South Carolina Supreme Court cited decisions from the Oregon Supreme Court.  Douglass, 542 S.E.2d at 717 n.4;  Crandall, 395 S.E.2d at 180.  Specifically, the Douglass court cited the Oregon Supreme Court decision, Allen v. Hall, 974 P.2d 199 (Or. 1999), for the proposition that the tort of intentional interference with prospective contractual relations is analogous to the tort of intentional interference with inheritance.  Douglass, 542 S.E.2d at 717 n.4.

In Allen, the Oregon Supreme Court held that "intentional interference with a prospective inheritance may be actionable under a reasonable extension of the well-established tort known as intentional interference with economic relations."  974 P.2d at 202.  The Allen court pointed to "the very close analogy that exists between an expectancy of inheritance and those other interests to which this court already has extended the protections of the tort of intentional interference with prospective economic advantage," noting that "[a]lthough an expectancy of inheritance is, by definition, purely

11

prospective, so are many of the commercial interests that have been associated with and are protected by the tort." Id.  The same analogy can be drawn in South Carolina, where courts have also recognized that the tort of intentional interference with prospective contractual relations protects purely prospective interests, such as a plaintiff's "reasonable expectation of benefits." United Educ. Distribs, LLC v. Educ. Testing Serv., 564 S.E.2d 324, 329 (S.C. Ct. App. 2002).

Moreover, after citing Allen, the Douglass court listed the elements of intentional interference with inheritance, citing multiple state courts that have adopted the tort and the Restatement (Second) of Torts section articulating the trot.  542 S.E.2d at 717 n.4. Notably the court did not cite any authority rejecting the application of the tort.

The court finds that the foregoing case law strongly suggests that the South Carolina Supreme Court would adopt the tort of intentional interference with inheritance.[7]

### 2.    Majority Rule

Restatement (Second) of Torts § 774B, cited by the South Carolina Supreme Court in Douglass, states that "[a] substantial majority of the cases now grant recovery in tort for intentionally and tortiously interfering with the expectation of an inheritance or gift."  Restatement (Second) of Torts § 774B reporter's note (1979); see also Marshall v. Marshall, 547 U.S. 293, 296 (2006) (recognizing intentional interference with inheritance as a "widely recognized tort"); Beckwith v. Dahl, 141 Cal. Rptr. 3d 142, 148 (Cal. Ct. App. 2012) (joining "the majority of other states in recognizing the tort of [intentional

---

[7] There is some question whether the tort would be adopted as a separate tort or whether it would be subsumed under intentional interference with prospective contractual relations, as in Allen.  The answer, however, seems predominantly academic, as the elements would be substantially the same either way.

interference with an expected inheritance]"); <u>Doughty v. Morris</u>, 871 P.2d 380, 387 (N.M. Ct. App. 1994) (same); <u>Nemeth v. Banhalmi</u>, 425 N.E.2d 1187, 1190 (Ill. App. Ct. 1981) (same).

    Here, Wendy argues that there is no true majority, as only twenty-five states have adopted the tort of intentional interference with inheritance.  Def.'s Supp. Reply 3.  While different observers have reached difference conclusions as to the specific number of states that have adopted the tort, what is clear is that "a majority of courts that have considered the tort have approved it."  Nita Ledford, Note--Intentional Interference with Inheritance, 30 Real Prop. Prob. & Tr. J. 325, 352 (1995) <u>see also</u> John C.P. Goldberg & Robert H. Sitkoff, Torts and Estates: Remedying Wrongful Interference with Inheritance, 65 Stan. L. Rev. 335, 362 (2013) (recognizing that while appellate courts in twenty states have recognized the tort, "these numbers understate courts' receptiveness to the tort," and noting that only three states have rejected it).  Thus, even if a formal majority of states has not adopted the tort, the court finds it significant that the great majority of courts that have reached the issue have adopted it.

    Wendy also argues that the court must consider differences in the character, origin, and elements of each state's version of the tort when assessing the strength of the majority position.  Def.'s Supp. Reply 3.  Unsurprisingly, although states have adopted different formulations of the tort, the court is not convinced that the differences are significant enough to undermine the clear trend toward the tort's adoption.  The core elements recognized in <u>Douglass</u> are analogous to formulations used in other states, which sometimes require "a causal effect between the interference and the harm" rather than a "reasonable certainty that the expectancy would have been realized," or an

13

"improper means or [an] improper purpose" rather than "tortious conduct."  See Allen, 974 P.2d at 205.

As noted above, the South Carolina Supreme Court has "join[ed] the vast majority of [its] sister jurisdictions in recognizing" the tort of intentional interference with prospective contractual relations.  Crandall, 395 S.E.2d at 180.  There is no apparent reason why South Carolina would not join the majority of state courts in recognizing the closely analogous tort of intentional interference with inheritance.  Thus, to the extent this court must consider the "majority position" as a factor in its analysis, this factor clearly weighs in favor of the tort's adoption.

### 3.    Treatises

Section § 774B of the Restatement (Second) of Torts ("the Restatement") defines the tort of intentional interference with inheritance as:  "One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift."  This tort "represents an extension to a type of noncontractual relation of the principle found in the liability for intentional interference with prospective contracts."  Restatement (Second) of Torts § 774B cmt. a (1979).

The South Carolina Supreme Court's reliance on the Restatement supports recognizing the tort of intentional interference with inheritance.  For example, in Crandall, the South Carolina Supreme Court cited the Restatement in recognizing intentional interference with prospective contractual relations.  395 S.E.2d at 180. Additionally, South Carolina courts have frequently looked to the Restatement when interpreting other areas of South Carolina law.  See, e.g., Babb v. Lee Cty. Landfill S.C.,

14

LLC, 747 S.E.2d 468, 473 (S.C. 2013) (noting that the Restatement "bolster[ed]" its

conclusion regarding the torts of trespass and nuisance); Ford v. Hutson, 276 S.E.2d 776,

778 (S.C. 1981) (adopting rule of liability from the Restatement regarding intentional

infliction of emotional distress); Sims v. Giles, 541 S.E.2d 857, 870 (S.C. Ct. App. 2001)

(citing extensively to the Restatement in distinguishing between invitee and licensee

status).

   Besides the Restatement, other treatises have also recognized the tort of

intentional interference with inheritance.  See Dan B. Dobbs et al., The Law of Torts §

642 (2d ed.) ("Most courts addressing the issue have recognized a cause of action against

defendants who prevent the plaintiff from receiving an inheritance or gift she would

otherwise have received, provided the defendant uses undue influence, duress, or tortious

means such as fraud or murder."); W. Page Keeton et al., Prosser and Keeton on the Law

of Torts § 130 (5th ed. 1984) (noting that courts permit the tort with sufficient evidence

of "a high degree of probability that the testator would have made or changed a

bequest").  Notably, the South Carolina Supreme Court has cited to both Dobbs and

Keeton in analyzing intentional interference with prospective contractual relations.  See

Eldeco, Inc. v. Charleston Cty. Sch. Dist., 642 S.E.2d 726, 732 n.5 (S.C. 2007) (citing

both treatises for the requirement that intentional interference with prospective

contractual relations "require[s] the intent to interfere for an improper purpose rather than

a motive generally grounded in some sort of spite or ill-will towards the plaintiff").

   The tort treatises' general acceptance of the tort of intentional inference with

inheritance and the South Carolina Supreme Court's historical reliance on these same

treatises suggests that the court would follow them in adopting this tort.

#### 4.     Recent Pronouncements of General Rules or Policies

Finally, the South Carolina Supreme Court has recently recognized that the interests of intended beneficiaries of wills and trusts are entitled to protection under South Carolina law and has expanded an existing tort to provide a remedy for negligent harm to intended beneficiaries.[8]  In Fabian v. Lindsay, the South Carolina Supreme Court recognized, for the first time, a cause of action in both tort and contract "by a third party beneficiary of an existing will or estate planning document against a lawyer whose drafting error defeats or diminishes the client's intent."  765 S.E.2d 132, 141.  In Fabian, the plaintiff brought an action for professional negligence and breach of contract against her late uncle's lawyer, alleging that the lawyer's drafting error in her uncle's trust resulted in her being disinherited.  Id. at 134–35.  Notably, while the dissent would not have recognized a breach of contract claim under the circumstances, the court unanimously agreed that the tort claim should be recognized.[9]

In doing so, the court adopted a "balancing of factors test" previously articulated by the Supreme Court of California in Lucas v. Hamm:

> [T]he determination [of] whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm.

---

[8] This factor presents another notable similarity to the Oregon Supreme Court's decision in Allen, where the court observed that "prospects of inheritance long have been recognized as interests that are worthy of common-law protection." Allen, 974 P.2d at 202 (citing to Hale v. Groce, 744 P.2d 1289, 1293 (Or. 1987)) (permitting an intended beneficiary of a will to sue an attorney who failed to include a gift in the testator's will).

[9] The concurrence and dissent disagreed with the majority regarding the standard of proof to be applied.

Id. at 137 (quoting Lucas v. Hamm, 364 P.2d 685, 687 (Cal. 1961)).  The court noted that

the Lucas court, in applying these factors, reasoned that

> one of the main purposes which the transaction between defendant and the
> testator intended to accomplish was to provide for the transfer of property
> to plaintiffs; the damage to plaintiffs in the event of invalidity of the
> bequest was clearly foreseeable; it became certain, upon the death of the
> testator without change of the will, that plaintiffs would have received the
> intended benefits but for the asserted negligence of defendant; and if
> persons such as plaintiffs are not permitted to recover for the loss resulting
> from negligence of the draftsman, no one would be able to do so, and the
> policy of prevent[ing] future harm would be impaired.

Id. at 137-38 (quoting Lucas, 364 P.2d at 688).

    Here, many of these same factors mentioned in Fabian weigh in favor of

recognizing a claim for intentional interference with inheritance.  First, damage to the

Wellin children is foreseeable.  Second, it would become certain upon the Keith's death

that, but for the interference with inheritance, the Wellin children would have received

the intended benefits.  Finally, recognizing the tort will prevent future harm by holding

interferers accountable for their actions.  As noted by the Wellin children, because

intentional interference with inheritance deals with intentional action, it would seem even

more deserving of liability than the conduct at issue in Fabian, which was merely

negligent.

    Based on past well-considered dicta, the majority rule, treatises, and recent

pronouncements of general rules or policies by the state's highest court, the court predicts

that the South Carolina Supreme Court would recognize the tort of intentional

interference with inheritance.[10]  Although Wendy argues that the numerous differences in

---

[10] The court also notes that the reporter's comments to South Carolina Code assume that a
claim for intentional interference with inheritance exists under South Carolina law.  S.C. Code §
62-7-604 reporter's cmt. (providing a claim for intentional interference with inheritance is not

the variety of elements, prerequisites, and standards used by courts to enforce this tort make this issue more appropriate for certification to the South Carolina Supreme Court, certification should only be used when available state law is "clearly insufficient." Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994).

    The court does not find the available state law insufficient in this case. The elements set forth in Douglass are very similar to the elements required by other courts that have adopted the tort. See Douglass, 542 S.E.2d 715, 717 n.4 ("(1) the existence of an expectancy (2) an intentional interference with that expectancy through tortious conduct (3) a reasonable certainty that the expectancy would have been realized but for the interference and (4) damages.").[11] These elements are also conceptually consistent with the elements required by the Oregon Supreme Court in Allen. See Allen, 974 P.2d at 202 ("(1) the existence of a [prospective inheritance]; (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages."). Courts have also found these elements to be consistent with Section § 774B of the Restatement (Second) of Torts. See Morrill, 712 A.2d at 1041 (stating "[w]e have adopted the Restatement formulation of the tort" and listing elements consistent with those found in Douglass). The policy motivations underlying the South Carolina Supreme Court's recent decision in Fabian also weigh in favor of the tort's adoption. Thus, it is appears likely that the South

_____

subject to the statute of limitations in that section and referring the Restatement (Second) of Torts § 774B for the law on such a claim).
    [11] Compare Morrill v. Morrill, 712 A.2d 1039, 1041-42 (Me. 1998) ("(1) the existence of an expectancy of inheritance; (2) an intentional interference by a defendant through tortious conduct, such as fraud, duress, or undue influence; (3) a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from that interference.").

18

Carolina Supreme Court would adopt the tort of intentional interference with inheritance,

and in doing so, the court would require plaintiffs to prove the elements set forth in

Douglass.

### 5.     Availability of Remedy at Probate

Wendy also contends that the court must predict whether the South Carolina

Supreme Court would restrict the tort to cases where the plaintiff has no adequate remedy

at probate.[12]  Reply Supp. Mem. 4.  Though it is a somewhat closer question, the court

finds that the South Carolina Supreme Court would likely adopt this prerequisite.

Numerous states, including three of the states cited in Douglass, have restricted the tort in

some way based on the availability of a remedy in probate.  See Roll v. Edwards, 805

N.E.2d 162, 169 (Ct. App. Ohio 2004) (holding that "a claim for intentional interference

with expectancy of inheritance may not be pursued if adequate relief is available to the

plaintiff through probate procedures," and recognizing other jurisdictions have adopted

this same approach); Wilson v. Fritschy, 55 P.3d 997, 1001–06 (N.M. Ct. App. 2002)

(stating that "of those states that have considered the tort of intentional interference with

inheritance, most have held that claims in tort may only be brought when there is no

adequate remedy in probate," and adopting the same approach); see also In re Estate of

Ellis, 923 N.E.2d 237, 243 (Ill. 2009) (recognizing that a plaintiff may not bring a claim

for intentional interference with inheritance where the plaintiff "fails to bring a tort claim

within the period for filing a will contest, where the will contest remedy was available").

This approach is consistent with the goal of protecting beneficiaries who would otherwise

---

[12] Wendy also insists that the court establish a standard of proof.  Def.'s Supp. Reply, 4.
To the extent this is not implicit in the elements listed in Douglass, the court declines to adopt a
standard of proof at the dismissal stage.

be left without a remedy, which has been a significant justification for the expansion of tort liability to protect inheritance expectancies in many jurisdictions, including South Carolina. See Nemeth, 425 N.E.2d at 1187 (stating that the rationale for adopting the tort of intentional interference with inheritance often includes the "principle of justice that no wrong is without a remedy"); see also Fabian, 765 S.E.2d at 140 (recognizing a cause of action for legal malpractice against a decedent's attorney where, under the circumstances, failing to recognize such a cause of action would leave beneficiaries to decedent's will without a remedy").

Moreover, without this restriction, the tort would conflict with South Carolina's legislative preference for adjudicating estate-related claims in probate court as evidenced by S.C. Code Ann. § 62-1-302, which grants probate courts "exclusive original jurisdiction over all subject matter related to . . . estates of decedents."[13]  See Minton v. Sackett, 671 N.E.2d 160, 162 (Ind. Ct. App. 1996) ("A majority of the states which have adopted the tort . . . have achieved [] a balance [between the competing goals of providing a remedy to injured parties and honoring the strictures of our probate code] by prohibiting a tort action to be brought where the remedy of a will contest is available and would provide the injured party with adequate relief.").  In light of these considerations, the court finds that South Carolina courts would not permit plaintiffs to bring a cause of action for intentional interference with inheritance where an adequate remedy exists at probate.[14]

---

[13] The probate exception to federal diversity jurisdiction reinforces the importance of this conflict.  Without the abovementioned restriction, many disputes that might otherwise be forced into probate proceedings, and thus, outside the scope of federal diversity jurisdiction, would be able to circumvent not only probate court, but state court altogether.

[14] Although this approach conflicts with that of the Oregon Supreme Court in Allen, South Carolina courts need not follow Oregon courts with respect to every issue involved in the

### 6.     Conclusion

Applying these elements to the case at hand, the court finds that the Wellin children have sufficiently pleaded a plausible claim for intentional interference with inheritance.  As an initial matter, it is clear that at least a portion of the damages sought in the Wellin children's complaint, particularly the damages arising from wrongful inter vivos transfers, could not be recovered through probate remedies.  See Compl. ¶ 113. Turning to the elements of the tort of intentional interference with inheritance, the Wellin children have sufficiently pleaded: (1) a valid expectancy that they would inherit the vast majority of their father's estate, based on Keith's consistent, long-standing estate plan prior to 2013,  compl. ¶ 103-05; (2) that Wendy intentionally interfered with that expectancy through tortious conduct, in the form of fraudulent misrepresentations, defamatory statements, and undue influence, id. at 72, 73, 74, 108, and 112; (3) that, but for Wendy's conduct, there is a  reasonable certainty that the expectancy would have been realized, based on the timing and nature of the alleged tortious conduct, id. at 109-11 and 113; and (4) damages, in the form of lost devises and bequests that would otherwise have been distributed to the Wellin children through Keith's will, Revocable Trust, and IRA Designation form, id. at 110 and 113.  Notably, Wendy does not argue that the Wellin children have failed to plead any of these elements.  Therefore, the court denies Wendy's motion to dismiss the claim for intentional interference with inheritance claim.

---

tort's application, especially where, as here, such an approach conflicts with a fundamental justification for the tort's adoption.

21

B.     **Count III – Intentional Interference with Prospective Contractual Relations[15]**

Wendy next argues that the Wellin children's claim for intentional interference with prospective contractual relations should be dismissed because it is "an attempt to mask their intentional interference with inheritance claim." Def.'s Mot. 9; see also Reply Supp. Mem. 10 ("[T]he main purpose of [p]laintiff's third cause of action is to restate, almost verbatim, their claim for [intentional interference with inheritance.] [T]he applicability of this claim should be determined along with the [intentional interference with inheritance] claim, as stating both causes of action would be duplicative."). The Wellin children admit that the "allegations under [their intentional interference with prospective contractual relations] claim primarily relate to [Wendy's intentional interference with inheritance]." Pls.' Resp. 16. Therefore, the court dismisses this claim to the extent it is based on Wendy's interference with the Wellin children's expectation that they would receive certain bequests under Keith's estate planning documents. Compl. ¶ 120–21.

However, Marjorie also alleges that, as direct and proximate result of Wendy's intentional acts, Keith refused to consummate a commercial sale of a property in Friendship, Maine, which has sentimental value to the Wellin children. Id. at ¶¶ 55, 83,

---

[15] The complaint titles this claim "intentional interference with prospective contractual advantage/prospective economic advantage." South Carolina courts have noted that labeling the cause of action as interference with prospective economic advantage does not change the substance of the cause of action. See United Educ. Distribs, 564 S.E.2d at 326 (holding that "[a]lthough the trial court identified this action as 'tortious interference with prospective economic advantage,' South Carolina has labeled this tort 'intentional interference with prospective contractual relations'" and noting that the court's decision to analyze the cause of action as intentional interference with prospective contractual relations did not affect the substance of their analysis).

and 127; Resp., 16.  This claim, which Wendy does not directly address, is not
duplicative of the claim for intentional interference with inheritance.

     To state a cause of action for intentional interference with prospective contractual
relations, a plaintiff must prove:  "(1) the defendant intentionally interfered with the
plaintiff's potential contractual relations; (2) for an improper purpose or by improper
methods; (3) causing injury to the plaintiff."  Crandall, 395 S.E.2d at 180.  "If a
defendant acts for more than one purpose, his improper purpose must predominate in
order to create liability."  Id.  "As an alternative to establishing an improper purpose, the
plaintiff may prove the defendant's method of interference was improper under the
circumstances."  Id.

     Wendy argues that the intentional interference with prospective contractual
relations claim fails because "[t]here was no contract and no existing business
relationship between [the Wellin children] and [Keith] through which [the Wellin
children] would have done business with [Keith] but for [Wendy's] alleged tortious
conduct."  Def.'s Mot. 10.  Wendy further argues that "South Carolina courts have not
held an [intentional interference with prospective contractual relations] exists where"
neither of the parties involved is a business.  Def.'s Supp. Reply 9.

     The relationship between a potential buyer of real estate and the potential seller of
real estate falls squarely within the scope of intentional interference with prospective
contractual relations.  The Restatement (Second) of Torts § 766B, cited by the court in
Crandall, recognizes that the tort applies to "the opportunity of selling or buying land or
chattels or services."  Restatement (Second) of Torts § 766B (1979).  Though the tort
requires a prospective contractual or business relationship, see United Educ. Distribs, 564

S.E.2d at 329–30, the court has found no indication that the tort is restricted to situations where such relationships are between business entities.  Rather, South Carolina courts have held that "a cause of action for intentional interference with prospective contractual relations generally stands following the loss of an identifiable contract or expectation." Id. at 328.  Specifically, "the allegations must present facts that give rise to some reasonable expectation of benefits from the alleged lost contracts."  Id. at 329.

Here, Marjorie has identified a specific contract that she expected to enter into with Keith—the purchase of the Friendship, Maine property—and indicated that Keith had expressed excitement about the transaction.  Compl. ¶¶ 55, 122.  Thus, the complaint pleads facts that would give rise to a reasonable expectation that the transaction would be realized.  Wendy has not otherwise challenged the adequacy of the complaint, and in any event, the court is satisfied that the remaining elements have been sufficiently pleaded. Therefore, the court denies Wendy's motion to dismiss Marjorie's claim for intentional interference with prospective contractual relations to the extent the claim arises from Marjorie's anticipated purchase of the Friendship, Maine property.

### C.    Count IV – Breach of Fiduciary Duty

The Wellin children's claim for breach of fiduciary duty alleges that Wendy, acting pursuant to her power of attorney as trustee of the Revocable Trust with respect to UBS Account number XXX-4378, breached her duty to the trust beneficiary through a series of wrongful purchases and distributions.  Compl. ¶¶ 137–39.  Wendy argues that the Wellin children's claim for breach of fiduciary duty should be dismissed because Wendy's power of attorney did not create a fiduciary relationship between herself and the

Wellin children, as the Wellin children were not vested beneficiaries[16] of the Revocable

Trust at the time the alleged breaches occurred.  Hr'g. Tr. 99:1–9.

This claim presents a choice of law issue.  The Original Revocable Trust provides

that it is governed by Florida law.  ECF No. 20, Ex. A at 18.[17]  The Amended Revocable

Trust, however, indicates that it is to be governed by South Carolina law.  ECF No. 20.,

Ex. B at 32.  Because Wendy has not argued that the Wellin children have failed to plead

sufficient facts to support their cause of action for declaratory judgment, which seeks to

have the Amended Revocable Trust declared "ineffective, invalid, *ultra vires*, and void,"

the court will apply Florida law in interpreting and enforcing the terms of the Revocable

Trust.

The Wellin children note that under Florida law, a vested beneficiary may sue a

trustee for breach of a duty owed to a settlor/beneficiary that occurred during the

settlor/beneficiary's lifetime, which subsequently affects the interest of the vested

beneficiary.  Brundage v. Bank of Am., 996 So. 2d 877, 882 (Fla. Dist. Ct. App. 2008).

The Wellin children argue that this rule should extend to Wendy's breach of her fiduciary

duties to Keith.  Specifically, they argue that as the power of attorney for the Revocable

Trust, Wendy had a duty to act in the best interests of Keith, the settlor/beneficiary of the

Revocable trust.  Pls.' Resp. 29.  Wendy argues that her fiduciary duty under the power

of attorney was only to Keith, and the Wellin children are not entitled to bring a claim on

his behalf.  Hr'g. Tr. 99:1–9.   Thus, as an initial matter, the court must decide the

---

[16]  Though the complaint refers to the "children," the Wellin children's reply clarifies that only Marjorie and Cynthia are vested beneficiaries of the Amended Revocable Trust.  Pl.'s Reply 29.  Therefore, the Wellin children have decided to bring the claim for breach of fiduciary duty on behalf of Marjorie and Cynthia only.  Id. at 30 n.11.

[17]  The two versions of the Revocable Trust are attached to Wellin children's response to a separate motion to dismiss.  ECF No. 20.

threshold question of whether Florida law would allow a vested beneficiary to bring

claims for a breach of a fiduciary duty owed to the settlor/beneficiary against persons

other than trustees.  This analysis seeks to determine whether Florida law would allow

the Wellin children to step into Keith's shoes and utilize a claim that would otherwise

belong only to him.[18]

Florida courts have not discussed the nature of a vested beneficiary's right to

bring claims against a trustee for the breach of a fiduciary duty owed to the

settlor/beneficiary.  The Wellin children rely on Brundage v. Bank of Am., in which the

court indicated that beneficiaries are allowed to bring such claims because they are

harmed by the trustee's conduct:

> [O]nce the interest of the contingent beneficiary vests upon the death of
> the settlor, the beneficiary may sue for breach of a duty that the trustee
> owed to the settlor/beneficiary which was breached during the lifetime of
> the settlor and subsequently affects the interest of the vested beneficiary.
> Smith v. Bank of Clearwater, 479 So. 2d 755 (Fla. Dist. Ct. App. 1985),
> illustrates this principle.  In Smith the court held that a contingent
> remainderman of a trust, whose interest vested with the death of the
> lifetime beneficiary, had standing to sue for mismanagement of trust assets
> during the lifetime of the income beneficiary, because such
> mismanagement diminished the value of the trust assets to which the
> remainderman was entitled. The trustee owed the lifetime beneficiary the
> duty to properly manage the assets of the trust, and a breach of that duty
> could be enforced by the remainderman.

Brundage v. Bank of Am., 996 So. 2d 877, 882 (Fla. Dist. Ct. App. 2008) (emphasis

added).  Siegel v. Novak, cited approvingly in Brundage, applied the same principle

under New York law, stating that preventing beneficiaries from bringing such claims

would violate the court's "sense of justice." 920 So. 2d 89, 96 (Fla. Dist. Ct. App. 2006).

---

[18] The claim might alternatively be analyzed under New York law, by asking whether the fiduciary duties under the power of attorney extend to third parties, such as the Wellin children. Because an affirmative answer to either question is sufficient to determine the instant motion, analysis under the second approach would be superfluous.

The <u>Siegel</u> court explained that "a trustee should not be able to violate its fiduciary duty and authorize withdrawals contrary to the provisions of the trust, and yet escape responsibility because the settlor did not discover the transgressions during her lifetime." <u>Id.</u> This rationale would certainly extend to claims alleging breaches of other fiduciary duties owed to the settlor, especially where, as here, the fiduciary duty at issue gave the defendant the power to act as a trustee. Compl. ¶ 137. Therefore, because the Wellin children have sufficiently pleaded facts establishing that they are vested beneficiaries of the Revocable Trust and were harmed by Wendy's breach of her fiduciary duties, the court finds that they may bring a cause of action based on such a breach.

Having established that the Wellin children may assert such a claim, the court turns to the question of whether the Wellin children have pleaded facts showing that Wendy actually breached her fiduciary duty as Keith's power of attorney.[19] New York law provides that a power of attorney owes fiduciary duties to the principal "[t]o act according to any instructions from the principal or, where there are no instructions, in the best interest of the principal," and that one "may be subject to liability for conduct or omissions which violate any fiduciary duty." N.Y. Gen. Oblig. Law § 5-1505.

In this case, where the power of attorney placed Wendy in the position of trustee of the Revocable Trust, the fiduciary duties Wendy owed pursuant to this power encompassed the trustee's duty to act in the best interests of the settlor/lifetime beneficiary and comply with the provisions of the Revocable Trust. The complaint states that Wendy breached this duty by wrongfully transferring trust assets and spending funds in excess of the amount customarily spent by the trustee to maintain Keith and Wendy's

---

[19] It is uncontested that the power of attorney is governed under New York law.

27

lifestyle.  Compl. ¶¶ 139(a)–(e).  The court finds that these allegations support a plausible

claim against Wendy for breach of fiduciary duty and denies Wendy's motion to dismiss

this claim.

### D.     Counts V, VI, & VII – Breach of Prenuptial Agreement

Wendy argues that the Wellin children's claims for breach of the prenuptial

agreement should be dismissed because the Wellin children are not parties to the

agreement, and are not entitled to enforce the agreement as third party beneficiaries.

Def.'s Mot. 11.

The parties agree that the prenuptial agreement is governed by Florida law.

Def.'s Mot. 12, Ex. 1 at 18[20] (stating that "[t]he laws of the state of Florida shall govern

the validity, construction, interpretation and effect of this Agreement"); Pls.' Resp. 17.

Under Florida law, prenuptial agreements are governed by the law of contracts.  Taylor v.

Taylor, 1 So. 3d 348, 350 (Fla. Dist. Ct. App. 2009).  To establish an action for breach of

a third party beneficiary contract under Florida law, a plaintiff must allege the following

elements:  "(1) existence of a contract; (2) the clear or manifest intent of the contracting

parties that the contract primarily and directly benefit the third party; (3) breach of the

contract by a contracting party; and (4) damages to the third party resulting from the

breach."  Found. Health v. Westside EKG Assocs., 944 So. 2d 188, 194–95 (Fla. 2006)

(citation omitted).  Wendy argues that the Wellin children do not satisfy the second

element, because Keith and Wendy did not intended that the contract "primarily and

directly benefit" the Wellin children.  Def.'s Supp. Reply 10–12.

---

[20] The court considers the prenuptial agreement at the motion to dismiss stage.  It was
attached to Wendy's motion to dismiss; it is clearly integral to, and was relied upon in the Wellin
children's complaint; and the Wellin children do not dispute its authenticity.  Blankenship v.
Manchin, 471 F.3d 523, 526 (4th Cir. 2006).

"The question of whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract." Carvel v. Godley, 939 So. 2d 204, 207–08 (Fla. Dist. Ct. App. 2006). "Unless a person is a party to a contract, that person may not sue . . . for breach of that contract where the non-party has received only an incidental or consequential benefit of the contract." Morgan Stanley DW Inc. v. Halliday, 873 So. 2d 400, 403 (Fla. Dist. Ct. App. 2004). "The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish." Carvel, 939 So. 2d. at 208.

The requirement that the contract "primarily and directly benefit" the third party, rather than simply provide an "incidental or consequential benefit," appears at first blush to be fairly strict. However, in application this rule is not so exacting. The case of Legare v. Music & Worth Const., Inc., 486 So. 2d 1359, 1360 (Fla. Dist. Ct. App. 1986), is instructive. In Legare, Music & Worth Construction, Inc. and Leon County entered into a contract for Music & Worth to repair a portion of a road. Id. at 1360 (Fla. Dist. Ct. App. 1986). The contract contained a provision requiring Music & Worth to "refrain from isolating places of business and [to provide] access to all places of business whenever construction interferes with existing means of access." Id. The plaintiffs, who were not parties to the contract or even mentioned by name in the contract, owned a business abutting the road and alleged that their business was a third party beneficiary of the contract between Music & Worth and Leon County. Id. at 1361. The Florida District Court of Appeals agreed, holding that the plaintiffs' allegations were "sufficient to raise a colorable cause of action under a third party beneficiary theory," and noting that such a

theory required contract provisions which "clearly establish the parties' intent to create a right primarily and directly benefiting the third party." <u>Id.</u> at 1362. <u>Legare</u> demonstrates that a third party beneficiary may "primarily and directly benefit" from a contract, even if the parties' principal motivation for entering into the contract was not to benefit the third party.

Here, the first page of the prenuptial agreement, under the section titled "Recitals," contains the following language:

> C. KEITH has three (3) adult children from a prior marriage, to wit: PETER J. WELLIN, MARJORIE W. KING, and CYNTHIA W. PLUM. <u>He seeks to protect their interests in his estate by having this Agreement in full force and effect.</u>

Def.'s Mot. Ex. 1 at 2 (emphasis added). The prenuptial agreement also guaranteed the Wellin children's access to Keith:

> 23. <u>Children's Right of Access to KEITH</u>. In the event KEITH becomes inform or mentally incapacitated, WENDY shall not take any action to prohibit PETER J. WELLIN, MARJORIE W. KING, and/or CYNTHIA W. PLUM reasonable rights of access to KEITH, but will encourage and guarantee their reasonable right of access to KEITH.

<u>Id.</u> at 17. Finally, Section 22 of the prenuptial agreement required the Wellin children's unanimous consent to modify the agreement, along with the consent of Wendy's daughter from a prior marriage. <u>Id.</u> at 16-17. These provisions support the conclusion that the parties intended the prenuptial agreement to benefit Wellin children.

Wendy contends that Florida law requires that <u>both</u> parties to a contract intend that the contract benefit the third party beneficiary, and, whatever Keith's intent may have been, there is nothing to indicate that she intended for the Wellin children to benefit from the agreement. Def.'s Supp. Reply 11. In support, Wendy cites <u>Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.</u>, 647 So. 2d 1028, 1031 (Fla. Dist. Ct. App. 1994). In

30

Caretta the purchaser of a yacht was found not to be a third party beneficiary of a contract between the yacht's manufacturer and the manufacturer's paint supplier, despite the allegation that the paint supplier was aware that the manufacturer used the paint on yachts produced for third parties. Caretta, 647 So. 2d. at 1031–32. Notably, there was nothing to indicate that the contract at issue was intended for the plaintiff, specifically. Id. at 1031. The Caretta court clearly recognized that the situation would be different where the seller was aware that the product was intended for a specific person. Id. at 1032 (distinguishing Warren v. Monahan Beaches Jewelry Ctr., 548 So. 2d. 870 (Fla 1st DCA 1989), where a jeweler's knowledge that a ring was intended for the other contracting party's fiancé rendered the fiancé a third party beneficiary). Thus, the court finds Wendy's reliance on Caretta to be misplaced.

It is true that "in order to find the requisite intent, it must be shown that both contracting parties intended to benefit the third party." Id. at 1031. However, the court is not persuaded that a third party beneficiary must demonstrate that each party to the agreement subjectively desired or hoped that the third party would receive a benefit. Intent, in this context, appears more akin to "assent." Otherwise, many paradigmatic third party beneficiary scenarios would be defeated. For example, if a father paid a builder to construct a home for his child, under Wendy's theory, the child would not qualify as a third party beneficiary if the builder was indifferent to the ultimate recipient of the house, but was subjectively only interested in the payment received under the contract.

Here, Section 22 of the prenuptial agreement evidences Wendy's assent to the fact that the agreement would benefit the Wellin children. This section requires the Wellin children's unanimous consent to any modification of the agreement. The court finds that

31

it was Wendy's assent to the fact that the Wellin children would receive a benefit that made the Wellin children third party beneficiaries, not her subjective preferences or hopes.

Alternatively, Wendy argued at the hearing that even if the Wellin children are direct, intended beneficiaries of the provision of the agreement guaranteeing access to Keith, they were not the intended beneficiaries of the "separate property" provision, which prohibits Wendy from exercising control over Keith's property.  Hr'g. Tr., 96:1–8. Wendy did not provide any authority in support of this argument and she did not discuss this argument in her supplemental briefing.

Even if a provision-specific analysis is appropriate, the court finds that a single contractual provision that does not mention a third party can nevertheless be held to directly benefit that third party based on contextual interpretation.  As an initial matter, the recital and modification provisions are at least plausible indications that the Wellin children were intended to benefit from the entire agreement in whatever way it affected their interests, especially their interests in Keith's estate.  See Def.'s Mot. Ex. 1 at 2 ("[Keith] seeks to protect their interests in his estate by having this Agreement in full force and effect.").  The separate property provision protecting Keith's ability to "dispose of any and all [of his Separate Property] . . . in any manner including inter vivos or testamentary transfer, gift or any other disposition" clearly affected the Wellin children's interest in his estate.  See Def.'s Mot. Ex. 1, 9.  Thus, the separate property provision can be understood to have directly benefited the Wellin children.

The fact that Keith also benefited from this provision does not change the court's conclusion.  The separate property provision is comparable to the provision at issue in

McKinney v. Balboa Ins. Co., 2013 WL 4495185, at *5 (M.D. Fla. Aug. 19, 2013), where the court found a borrower was a third party beneficiary to a lender's insurance policy based on a provision allowing the borrower to recover residual loss amounts beyond the lender's insurable interest. Though Keith, like the lender in Balboa, was more certain to benefit from the separate property provision, the fact that the parties' contemplated the Wellin children's benefit is enough to establish the Wellin children as third party beneficiaries.

At the hearing, Wendy also mentioned that case law suggests that a third party beneficiary must receive a benefit that is "economic in nature." Hr'g. Tr. 95:17. Wendy cited no case specifically stating this proposition, and it does not seem consistent with the finding in Warren that a ring purchaser's fiancé was an intended third party beneficiary to the contract between the purchaser and seller. Warren, 548 So. 2d at 872. Though an engagement ring certainly carries economic value, as does access to a wealthy father, it would be odd to characterize either as a purely economic interest. Therefore, to the extent Wendy argues that the Wellin children cannot bring an action as third party beneficiaries under the agreement's "right to access" provision because their benefit from that provision was not economic in nature, the court concludes that there is no such requirement.

Lastly, Wendy argues that the Wellin children's accusations of undue influence and coercion are not sufficient to support their cause of action for breach of contract accompanied by fraudulent act. Hr'g. Tr. 97:21–98:8. This brief statement was the only mention of this argument. Therefore, the court is not positioned to provide an in depth discussion of this issue. For the time being, the court finds that the Wellin children have

33

sufficiently alleged a cause of action for breach of contract accompanied by fraudulent act based on the fact that Wendy's breaches were accompanied by intentional lies and defamation.  Compl. ¶ 163(b).  As it is clear that the Wellin children have stated a cause of action, and the issue has not been briefed, the court refrains from deciding the extent to which that cause of action can be supported by particular acts undue influence.

Therefore, the court denies Wendy's motion to dismiss the breach of contract claims.

### E.    Count VIII – Constructive Trust

Wendy next argues that the Wellin children's cause of action for constructive trust should be dismissed because the accusations contained in the complaint are conclusory.  Def.'s Mot. 13–14 (stating that "nowhere in the seven pages of 'facts' regarding [Wendy's] 'course of conduct' or in the cause of action itself do [the Wellin children] explain how or why any of the alleged behavior alleged (sic) is fraudulent").

"An action to declare a constructive trust is in equity, and a reviewing court may find facts in accordance with its own view of the evidence."  Carolina Park Assocs., LLC v. Marino, 732 S.E.2d 876, 879 (S.C. 2012) (citation omitted).  "A constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding legal title."  Id. (citation and quotation marks omitted).  Constructive trusts result from "fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution" and "is resorted to by equity to vindicate right and justice or frustrate fraud."  Id. (citations and quotation marks omitted).  "Fraud is an essential element, although it need not be actual fraud."  Lollis v. Lollis, 354 S.E.2d 559, 561 (S.C. 1987).

34

As detailed in the background discussion above, the Wellin children have identified specific misconduct by Wendy, including allegedly false statements that Wendy made to Keith.  See Compl. ¶ 73.  Therefore, the court finds that the Wellin children have pleaded sufficient facts to survive Wendy's motion to dismiss their constructive trust claim.

**F.      Count IX – Barratry**

Wendy next argues that the Wellin children's claim for barratry should be dismissed because the common law cause of action for barratry has been abolished. Def.'s Mot. 15.

Barratry "is the offense of frequently exciting and stirring up quarrels and suits between other individuals."  Osprey, Inc. v. Cabana Ltd. P'ship, 532 S.E.2d 269, 273 (S.C. 2000).  Barratry is a "form[] of maintenance, which is defined as 'an officious intermeddling in a suit that in no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend [the suit].'"  Id. (quoting 14 C.J.S. Champerty and Maintenance § 2(b); 14 Am. Jur. 2d Champerty and Maintenance § 2). The South Carolina Supreme Court described the relationship between the related concepts of barratry, champerty, and maintenance as follows:  "[p]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty."  Id. (quoting In re Primus, 436 U.S. 412, 424 n.15 (1978)).  Barratry, champerty, and maintenance "are aimed at the prevention of multitudinous and useless lawsuits and at the prevention of speculation in lawsuits."  Id. (quoting 14 C.J.S. Champerty and Maintenance § 2).

35

In Osprey, Inc. v. Cabana Ltd. P'ship, the South Carolina Supreme Court recognized that the defense of champerty had existed in South Carolina to that point, pointing to S.C. Code Ann. § 14-1-50, which states that "[a]ll, and every part, of the common law of England . . . is hereby continued in full force and effect in the same manner as before the adoption of this section." 532 S.E.2d at 272–73 (citing Osprey, Inc. v. Cabana Ltd. P'ship, 509 S.E.2d 275, 277 (Ct. App. 1998)). This rationale is equally applicable to the offense of barratry, a cause of action tracing its lineage to English common law. See State v. Chitty, 17 S.C.L. 379, 391 (S.C. App. L. & Eq. 1830) (stating that the offense of barratry "is known to our law, only through the medium of the act of 1712, making the whole common law of force"). The Ospery Court went on to abolish champerty as a defense, stating that "other well-developed principles of law can more effectively accomplish the goals of preventing speculation in groundless lawsuits and the filing of frivolous suits than dated notions of champerty." Osprey, at 532 S.E.2d at 277.

Wendy asserts that Osprey "presumably abolished the related context of barratry as well." Def.'s Mot. 16. However, in abolishing champerty, the Osprey court noted that "other well-developed principles of law can more effectively accomplish the goals of preventing speculation in groundless lawsuits and the filing of frivolous suits than dated notions of champerty." 532 S.E.2d at 277. In its discussion of these well-developed principles, the court pointed to the misdemeanor criminal offense of barratry, citing S.C. Code Ann. § 16-17-10, and also cited S.C. Code § 16-17-50, which provides that the statutory barratry provisions are cumulative and not intended to repeal any common law provisions regarding barratry. Id. at 277–78; see also Hickey v. Resolution Mgmt. Consultants, Inc., No. 2:12-cv-0707, 2012 WL 2512937, at *6 (D.S.C. June 29, 2012)

(citing S.C. Code § 16-17-50 for the proposition that "[t]he legislature's enactment of a criminal statute prohibiting barratry in no way voided the existing common law concerning the tort of barratry").  In <u>Hickey v. Resolution Mgmt. Consultants</u>, the court assumed without deciding that a civil claim for barratry "still exists" under South Carolina law, and interpreted <u>Osprey</u> as recognizing barratry as an example of one of the more well-developed principles of law that could accomplish the goals of champerty. <u>Hickey</u>, 2012 WL 2512937, at *6 n.11.  The <u>Hickey</u> court also determined that the enactment of a criminal statute prohibiting barratry "in no way voided the existing common law concerning the tort of barratry."  <u>Id</u>. at *6.  Thus, South Carolina courts' discussion of civil barratry, though infrequent, indicates that the cause of action for barratry does exist.

Wendy argues that, even if the cause of action for barratry exists, this claim must fail, because a barratry claim may only be brought against someone who has no direct or indirect interest in the outcome of the litigation.  Def.'s Supp. Reply 14.  As noted by the Wellin children, this proposition appears to be taken from the criminal barratry statute, which applies to any person who "[w]ilfully solicit[s] or incite[s] another to bring, prosecute or maintain an action" under a number of circumstances listed in subsections (1)(a) through (1)(e).  S.C. Code Ann. § 16-17-10.  Subsection (1)(b) applies to anyone who "has no direct and substantial interest in the relief thereby sought."  <u>Id.</u>  However, the court does not agree with Wendy's conclusion that all five subsections must be met to establish criminal barratry, as the conjunction "or" at the end of subsection (1)(d)

indicates that only one of the conditions listed in (1)(a) through (1)(e) need be satisfied.[21]
Id.  In any case, the elements of the criminal statute do not govern civil barratry.  As
discussed above, S.C. Code § 16-17-50 makes it clear that the provisions of the criminal
barratry statute do not abrogate the scope of civil barratry, which contains no such
restriction.  Osprey, 532 S.E.2d at 273.

Applying the definition of barratry used in Osprey,[22] the court finds that the
Wellin children have sufficiently pleaded facts to support a claim against Wendy for
"frequently exciting and stirring up quarrels and suits between other individuals."  See id.
Drawing all reasonable inferences in the plaintiff's favor, the Wellin children have
identified two lawsuits, Wellin I and McDevitt, which they contend Wendy "incited,
solicited, excited, and enticed" Keith and his attorneys to file.  Compl. ¶¶ 56, 62, 174.
Though Wendy is now a party to both actions, she was not a party to either at the time
each was filed.  Thus, the suits can fairly be said to have been "stirr[ed] up . . . between
other individuals."  Osprey, 532 S.E.2d at 273.

Wendy also argues that a claim for barratry can only be asserted against an
attorney, citing Stoudemire v. Branch Banking & Trust Bankcard Corp., No. 3:09-cv-
2485, 2010 WL 3447281, at *3 (D.S.C. Aug. 31, 2010).  Def.'s Mot. 17.  As an initial

---

[21] The court notes that the criminal barratry statute applies to any person who "willfully
incites another to bring . . . an action . . . with intent to distress or harass any party to such
action."  S.C. Code Ann. § 16-17-10.  Thus, even if the criminal barratry statute had any bearing
on the scope of the civil claim, it would indicate that the Wellin children's claim was viable.
[22] Though this definition was originally set forth in State v. Chitty, which was a criminal
prosecution for barratry, it was used by both the Ospery and Hickey courts in the civil context.
Osprey, 532 S.E.2d at 273 ("Barratry (or barretry) is the offense of frequently exciting and
stirring up quarrels and suits between other individuals.") (citing Chitty, 17 S.C.L. at 400);
Hickey, 2012 WL 3597077, at *1 (noting that "the common law definitions, as first announced in
Chitty apply when addressing a civil, not criminal, barratry claim," and denying defendant's
motion for reconsideration).

matter, the <u>Stoundemire</u> court's assertion that the claim for barratry "could only be asserted against Borger, an attorney," could be read as simply holding that the attorney was the only potential barrater in that case. <u>See</u> <u>Id.</u> at *3. The <u>Stoundemire</u> court does not cite any authority for the proposition that barratry can only be asserted against an attorney, and this court has been unable to find any. While the only South Carolina cases mentioning civil barratry may have involved claims against lawyers, there is nothing in the definition of barratry, or its rationale, that would justify this restriction. On the contrary, the <u>Chitty</u> court's discussion of barratry emphasizes the variety of potential offenders. <u>See</u> <u>Chitty</u>, 17 S.C.L. at 400 ("[H]e who promotes or excites unjust[] suits, although an offender of high rank, is not exclusively so. The busy-body, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means to extort money, is no less an offender against public justice.").

Therefore, the court denies Wendy's motion to dismiss the Wellin children's claim for barratry.

### G.     Count X – Negligence <u>Per Se</u>

Wendy, incorporating her arguments relating to barratry, argues that the Wellin children's claim for negligence <u>per se</u> should be dismissed because it is simply "another attempt to create a civil cause of action for barratry." Def.'s Mot. 18.

"Negligence <u>per se</u> is negligence arising from the defendant's violation of a statute." <u>Trivelas v. S.C. Dep't of Transp.</u>, 558 S.E.2d 271, 275 (S.C. Ct. App. 2001). "Negligence <u>per se</u> is established by showing a statute created a duty to the plaintiff and the defendant breached that duty by violating the statute." <u>Seals by Causey v. Winburn</u>,

445 S.E.2d 94, 96 (S.C. Ct. App. 1994).  To show that a duty of care arises from a statute, a plaintiff must establish that:  (1) the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) the plaintiff is a member of the class of persons the statute is intended to protect.  Wogan v. Kunze, 623 S.E.2d 107, 117-18 (S.C. Ct. App. 2005) (citing Rayfield v. S.C. Dep't of Corr., 374 S.E.2d 910, 914 (S.C. Ct. App. 1988)).  "If the plaintiff makes this showing, he has proven the first element of a claim for negligence: viz., that the defendant owes him a duty of care."  Id. at 118 (citation omitted).  "If he then shows that the defendant violated the statute, he has proven the second element of a negligence cause of action: viz., that the defendant, by act or omission, failed to exercise due care."  Id. (citation omitted).  Additionally, "the plaintiff must prove violation of the statute was causally linked, both in fact and proximately, to the injury."  Id. (citation omitted).

The Wellin children base their negligence per se claim on S.C. Code Ann. § 16-17-10(1)(C), which provides that:

> Any person who shall . . . [w]ilfully solicit or incite another to bring, prosecute or maintain an action, at law or in equity, in any court having jurisdiction within this State and . . . does so with intent to distress or harass any party to such action . . . [and] [s]hall be guilty of the crime of barratry.

The Wellin children allege that by inciting Keith and his attorneys to bring and maintain multiple lawsuits against them with intent to distress or harass them, Wendy breached a duty of care owed to them.  Compl. ¶¶ 180-83.

Wendy argues that the Wellin children have failed to provide sufficient facts to state a plausible claim and that they fail to allege that: (i) the essential purpose of § 16-17-10 is to protect the Wellin children or (ii) that they are a part of the class the statute is

40

meant to protect.[23]  Def.'s Mot. 19.  It is readily apparent that the essential purpose of §

16-17-10 is to protect people from being subjected to litigation brought for no purpose

other than to distress or harass.  The Wellin children clearly allege that they have been

subjected to such litigation.

Wendy also argues that the Wellin children's negligence per se claim fails

because is relies on a statute prohibiting intentional conduct, citing Karoly v. Sumner,

2007 WL 8327950 (S.C. Ct. App. July 31, 2007).  Def.'s Supp. Reply 14.  However,

Karoly is inapposite here because the Karoly court was constrained under the principles

of res judicata and collateral estoppel after a Pennsylvania court had already dismissed

the plaintiff's claim for negligence per se based on the same conduct in a prior action.

Karoly, 2007 WL 8327950, at *4.  Therefore, the Karoly court never reached the merits

under South Carolina law and its decision cannot be read as an endorsement of the

Pennsylvania court's reasoning.  It is simply an acknowledgment that the plaintiff's claim

and the issues it presented were already litigated.

The Wellin children rely on Norton v. Opening Break of Aiken, Inc., 443 S.E.2d

406 (Ct. App. 1994), to support their claim for negligence per se.  In Norton, the court

allowed the estate of a victim of an automobile accident caused by an intoxicated minor

to bring a negligence per se claim against an establishment that knowingly allowed the

minor to possess and consume alcohol on the premises, in violation of a state regulation.

---

[23] Wendy also argues that the Wellin children cannot prove a violation of § 16-17-10
because "they have not alleged any allegations in the entirety of the complain (sic) that would
satisfy S.C. Code § 16-17-10(1)(a) through (e), and they have explicitly alleged the opposite of
subpart (b) by alleging that [Wendy] has a direct and substantial interest in the relief sought in the
lawsuits."  Def.'s Mot. 18.  As discussed above, this argument is without merit.  Subparts (a)
through (e) of § 16-17-10(1) are phrased in the disjunctive and the Wellin children base their
claim on a violation of § 16-17-10(1)(c), which involves solicitation of lawsuits "with the intent
to distress or harass any party to such action."

Wendy argues that <u>Norton</u> is distinguishable, because the damages suffered in <u>Norton</u> were not intended by the conduct which violated the regulation.  Def.'s Supp. Reply 14–15.

This argument appears to be at odds with the doctrine of negligence <u>per se</u> in South Carolina, which allows a plaintiff to prove that a defendant failed to exercise due care by showing the defendant violated the relevant statute.  <u>Wogan</u>, 623 S.E.2d at 117–18.  On its face, South Carolina's interpretation of the doctrine of negligence per se indicates that courts simply look to the statute to determine the required mental state.  The court finds this interpretation strikingly similar to Kentucky's interpretation of the doctrine.  Specifically, in <u>Finn v. Warren Cnty., Ky.</u>, the court found that "when proviing negligence <u>per se</u>, the common-law negligence standard of ordinary care is replaced with a statutory or regulatory standard of care."  768 F.3d 441, 451 (6th Cir. 2014); <u>see also</u> Def.'s Supp. Reply 14–15 n.8 (attempting to distinguish <u>Finn</u> on the basis of this quotation).  Applying this rule, the <u>Finn</u> court explicitly acknowledged that plaintiffs were able, and indeed required, to show purposeful or intentional conduct to establish negligence <u>per se</u> based on a statute prohibiting "willful" violation of a county jail's policies.  <u>Finn</u>, 768 F.3d at 451.

A similar analysis is appropriate here.  Contrary to Wendy's assertion, a negligence <u>per se</u> claim based on the criminal barratry statute does not require the Wellin children to show that she "negligently committed an intentional tort."  It simply requires

them to show that Wendy violated the barratry statute.[24]  As discussed above, the Wellin

children have sufficiently pleaded facts showing that Wendy violated of the statute.

Therefore, the court finds that the Wellin children have adequately pleaded a

cause of action for negligence <u>per se</u> based on S.C. Code Ann. § 16-17-10.

---

[24] After establishing Wendy's violation of the statute, the Wellin children must also establish that the essential purpose of  the barratry statute was to prevent the alleged harm, and that they were members of the class of persons the statute was intended to protect.

### III.   CONCLUSION

For the foregoing reasons, the court **DENIES** Wendy's motion to dismiss the Wellin children's claims for intentional interference with inheritance, breach of fiduciary duty, breach of the prenuptial agreement related to the Wellin children's access to Keith, breach of the prenuptial agreement related to Wendy's control of Keith's separate property, breach of contract accompanied by a fraudulent act, constructive trust, barratry, and negligence <u>per se</u>.  The court **GRANTS** Wendy's motion to dismiss the Wellin children's claim for intentional interference with prospective contractual relations/prospective economic advantage, to the extent that claim is based on the Wendy's interference with the Wellin children's expectation that they would receive certain bequests under Keith's estate planning documents.  However, this claim may proceed to the extent it arises from Marjorie's anticipated purchase of the Friendship, Maine property.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2015**
**Charleston, South Carolina**

44